Electronically Filed
10/4/2019 1:37 PM
Steven D. Grierson
CLERK OF THE COURT

**NODP**
AARON D. FORD
  Attorney General
FRANK A. TODDRE II (Bar No. 11474)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
(702) 486-3149 (phone)
(702) 486-3773 (fax)
ftoddre@ag.nv.gov

*Attorneys for Defendants*
*State of Nevada, James*
*Dzurenda, Scherrie Bean,*
*and Ronrico Mangapit*

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| SHANNON CARTER, | Case No.  A-16-747779-C |
| Plaintiff, | Dept. No.  II |
| v. | |
| JOHN DOE (H.D.S.P. Dentist); S. BRUNS (Dental Assistant); JANE DOE (Dental Assistant); THE STATE OF NEVADA; JAMES DZURENDA Director of NDOC, | |
| Defendants. | |

### <u>NOTICE OF ENTRY OF ORDER OF DISMISSAL</u>

PLEASE TAKE NOTICE that the **ORDER OF DISMISSAL** was entered in the above-entitled matter on the 4th day of October, 2019, a copy of which is attached hereto as Exhibit A.

DATED this 4th day of October, 2019.

AARON D. FORD
Attorney General

By: */s/ Frank A. Toddre II*
    Frank A. Toddre II (Bar No. 11474)
    Senior Deputy Attorney General

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that I am an employee of the State of Nevada, Office of the Attorney

3   General, and that on the 4th day of October, 2019, I electronically filed the foregoing

4   **NOTICE OF ENTRY OF ORDER OF DISMISSAL** via this Court's electronic filing

5   system. Parties that are registered with this Court's electronic filing system will be served

6   electronically. For those parties not registered, service was made by depositing a copy for

7   mailing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada to the

8   following:

9   Shannon Carter, #70773
    Southern Desert Correctional Center
10  P.O. Box 208
    Indian Springs, NV  89070
11  *Plaintiff, Pro Se*

12

13                              /s/ *Barbara Fell*
                                An employee of the
14                              Office of the Nevada Attorney

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Order of Dismissal

# EXHIBIT A

Electronically Filed
10/4/2019 11:10 AM
Steven D. Grierson
CLERK OF THE COURT

ORDR
AARON D. FORD
 Attorney General
Frank A. Toddre II (Bar No. 11474)
 Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
555 East Washington Avenue, Suite 3900
Las Vegas, Nevada 89101
(702) 486-3149 (phone)
(702) 486-3773 (fax)
Email: ftoddre@ag.nv.gov

*Attorneys for Defendants
State of Nevada, James
Dzurenda, Scherrie Bean,
and Ronrico Mangapit*

# DISTRICT COURT

## CLARK COUNTY, NEVADA

SHANNON CARTER,

             Plaintiff,

v.

JOHN DOE (H.D.S.P. Dentist); S. BRUNS
(Dental Assistant); JANE DOE (Dental
Assistant); The STATE OF NEVADA;
JAMES DZURENDA Director of NDOC,

             Defendants.

Case No. A-16-747779-C
Dept. No. II

**Hearing Date: September 16, 2019
Hearing Time: 8:30 AM**

### [Proposed] ORDER OF DISMISSAL

Defendants, State of Nevada, ex rel. Nevada Department of Corrections, James

Dzurenda, Scherrie Bean, and Ronrico Mangapit, by and through counsel, Aaron D. Ford,

Nevada Attorney General, and Frank A. Toddre II, Senior Deputy Attorney General,

hereby submit the proposed Order dismissing this action with prejudice in its entirety. The

Court has requested that the undersigned prepare an order for the Court.

///

///

☐ Voluntary Dismissal       ☐ Summary Judgment
☐ Involuntary Dismissal     ☐ Stipulated Judgment
☒ Stipulated Dismissal      ☐ Default Judgment
☐ Motion to Dismiss by Deft(s)  ☐ Judgment of Arbitration

SEP 2 5 2019

Page 1 of 3

App 55

## I.   RELEVANT PLEADINGS AND DECISION

The Court is ruling upon the following pleadings:

- "Motion for Voluntary Dismissal or Alternative Motion to Stay" by Plaintiff filed August 28, 2019;

The Court is Vacating the Following Motions and Hearings

- "Defendant's Motion for Summary Judgment" filed August 19, 2019;
- "Motion for Enlargement of Time" filed by Plaintiff August 28, 2019;
- Pre-Trial Conference, set for September 25, 2019
- Calendar Call, set for October 9, 2019;
- Jury Trial, set for October 14, 2019

Both parties were present for a status check on September 16, 2019. The Court canvassed the parties regarding the Defendant's Summary Judgment motion and Carter's Motion for Voluntary Dismissal.

After colloquy regarding all outstanding motions and trial preparations, the Court asked Mr. Carter the status of the motion for voluntary dismissal. Carter advised the Court that he wished to voluntary dismiss the instant action, and pursue parallel litigation in the State of Nevada Federal District Court.

The Court canvassed Carter to ensure that he was consenting to the dismissal of the instant action. After further colloquy, Counsel for the Defendants affirmed that they would not oppose the dismissal of the action, and would consent to vacating pending motions and would not seek any punitive actions against Carter as it pertained to costs and/or sanctions.

Upon consent from both parties that Carter would dismiss the action, the Court dismissed the matter and vacated all pending hearings. Both parties would bear their own costs/fees associated with this litigation.

///
///
///
///

**II.    ORDER**

The Court ORDERS as follows:

1)    The Court GRANTS Carter's Motion to Voluntarily Dismiss. As such, this matter is DISMISSED WITH PREJUDICE, as Carter is pursuing similar litigation in the Nevada Federal District Court.

2)    The Court VACATES any further hearings, including dispositive motion filings, pretrial conferences, and jury trial.

**SO ORDERED.**

DATED: _____, 2019.

_____
DISTRICT COURT JUDGE
DEPARTMENT II
HON. RICHARD F. SCOTTI

RESPECTFULLY SUBMITTED BY:

AARON D. FORD
  Attorney General
Frank A. Toddre II (Bar No. 11474)
  Senior Deputy Attorney General
State of Nevada
Office of the Attorney General
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
(702) 486-3149 (phone)
(702) 486-3773 (fax)
*Attorneys for Defendants*

# EXHIBIT H

## DECLARATION OF DR. PAUL BITAR

# EXHIBIT H

## DECLARATION OF PAUL BITAR, DDS

I, Paul Bitar, DDS, being first duly sworn, under penalty of perjury under the laws of the United States deposes and says:

1. I am, and at all relevant times was, licensed to practice dentistry in the State of Nevada;

2. In connection with filing this declaration, I was contacted by the Nevada Attorney General's Office, who, on information and belief, is involved in the matter entitled *Carter v. Bean, et al.*, now proceeding in the United States District Court, District Of Nevada, as case number 2:19-cv-01628-RFB-EJY. It was requested that I provide truthful and accurate information concerning the authentication of certain documents and dental care provided to of inmate Shannon Carter (Mr. Carter), #70773;

3. Prior to making this declaration, I reviewed the medical chart and x-rays of Mr. Carter.

4. I am a defendant in this matter.

5. In February 2017, I was employed by the Nevada Department of Corrections (NDOC) as a Senior Institutional Dentist.

6. As a former Senior Institutional Dentist, I have knowledge of the process by which inmates request and receive dental care.

7. Inmates would typically submit an Inmate Request Form (kite) explaining the symptoms they are experiencing and requesting dental care. Kites are maintained in the normal course of business conducted NDOC.

8. Kites are compiled by dental staff and inmates are scheduled for are based upon priority and the date of submission.

9. As a former Senior Institutional Dentist, I also have knowledge of the process by which the dental care inmates receive is recorded. The dental care an inmate receives is recorded in each inmate's specific medical chart. The medical chart is created or updated at or near the time the care was administered by a provider who has knowledge of the care that the inmate received.

10. Inmate medical charts are maintained in the normal course of business conducted by NDOC.

11. Based upon my education, training, and experience, I have the ability to read patient medical charts, including inmate medical charts.

12. A true and correct copy of Mr. Carter's dental chart is attached hereto as Exhibit I.

13. On April 21, 2016, Mr. Carter was examined by Dr. Ronrico Mangapit for dental treatment due to Plaintiff's complaints of bleeding gums and need for filings.

14. The April 21, 2016, examination revealed Mr. Carter had occlusal caries (decay on the top of the teeth). He was scheduled for fillings and provided a pain pack of ibuprofen.

15. There was no indication Mr. Carter was suffering from infected teeth at the time of the April 21, 2016, examination.

16. Mr. Carter was seen on June 16, 2016, where he received a filling in tooth #31, which was the largest cavity so it did not worsen or require extraction.

17. At this June 16, 2016, visit, Mr. Carter underwent four (4) x-rays, was given anesthetic, and was scheduled to have another filling.

18. On September 5, 2016, Dr. Mangapit put a filling in tooth #19, and informed Mr. Carter to return if symptoms develop.

19. There is no evidence Mr. Carter was suffering from an oral infection at the time of the September 5, 2016, examination.

20. Mr. Carter was scheduled to have his third cavity filled on October 6, 2016, but the visit was cancelled due to an emergency recall by the prison.

21. Whenever a scheduled visit is cancelled, it is the inmate's obligation to submit a kite to have the visit rescheduled.

22. Mr. Carter did not submit any kites to have the October 6, 2016, visit rescheduled.

23. On January 6, 2017, Mr. Carter submitted a kite stating he was "filing a civil complaint on the constitutional violations made by dental" and requested "the full name of these defendants which are dentist ass. And the name of [his] dentist." A true and correct copy of this kite is attached hereto as Exhibit J.

24. On or about February 1, 2017, Mr. Carter, presented to the HDSP dental department.

25. During this visit, Mr. Carter stated that he did not have any current treatment needs. Instead, he represented that the only reason he scheduled the appointment was to obtain the names of the dental assistants and providers to use in a lawsuit.

26. I informed Mr. Carter that I could not provide him the names of the providers who had previously provided him treatment, and I told him he would need to request that information through a medical records request.

27. I did not review Mr. Carter's dental chart during this examination because Mr. Carter represented he did not need dental care.

28. Sherrie Bean (Ms. Bean), a dental assistant at the time of the examination, was present when Plaintiff presented. Ms. Bean never made any statement about being sued by Mr. Carter, and she never referred to him in a derogatory manner such as a "cry baby."

29. Mr. Carter was not asked to complete a "RELEASE OF LIABILITY FOR REFUSAL OF HEALTH CARE TREATMENT" (DOC 2523) because he did not request any dental care, and he was not offered any dental care to refuse.

30. As of February 1, 2017, I had no knowledge as to whether Mr. Carter had filed a lawsuit against Ms. Bean.

31. After Mr. Carter left, I wrote the following on the January 6, 2017, kite:

> Seen 2/1/17. Patient stated that all dental treatment had already been completed. Requested information cannot be released via this form.

32. After Mr. Carter left, I also wrote the following in his medical chart:

> Pt. brought up for dental appt. but pt didn't know why he was scheduled. Did not have chart at time to review hx. Dental kite requested names for a civil lawsuit only. Advised pt that info can't be released via kite form. Pt stated he already had all requested dental tx completed prior.

33. I never refused to provide Mr. Carter treatment for any reason, and I never attempted to coerce him into dismissing any lawsuit he had pending at the time of the examination.

34. I reviewed the x-rays taken on June 16, 2016, and it revealed the cavity in Mr. Carter's tooth #18 was minor and would not be expected to be causing excruciating pain, loss of sleep, or inability to eat at the time he presented on February 1, 2017.

35. There is no evidence in Mr. Carter's medical chart to suggest was suffering from an oral infection or bleeding gums from April 21, 2016, through February 1, 2017.

36. Following February 1, 2017, I did not receive or review any kites submitted by Mr. Carter wherein he complained of a dental condition or requested dental treatment.

37. If Mr. Carter needed dental care following February 1, 2017, but did not want to present to me, he could have submitted a kite requesting to be seen by a different NDOC dentist.

FURTHER I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

DATED this _____ day of July, 2020

_____

Dr. Paul Bitar

# EXHIBIT I

DENTAL CHART

# EXHIBIT I

CARTER, SHANNON

Name _____ DOB# _____    MEDICAL ALERTS

| DATE | PULHESD | SERVICES | SIGNATURE |
|---|---|---|---|
| 8/30/0 | | Exam Dental | |
| 10/24/08 | | + Pt. Signed refusal (CB) | Dale |
| 3/Jan 13 | | re: constant pain. Pants & grossly carious 18-30. Med 4x received. 3, 6cc? Lido r1:0 - 10 - one. cap #30 POT Dr. Maton Pain Pack | P. Henson |
| 4 Jan 13 | | Pt. Presents w/ swelling + reduced angular aperture at site. Dr. diffuse Palpation. Frozen cap site #30. 3.6cc? Lido r1:0 - Sene. TYD on all extract area incisor w/ drain saline. X-ray wnl. Dr. Maton Pain Pack. Pt Demerol 50 mg x 28. 2 Stat. Followed by 1 q6h till gone PN. POT, re-eval. | P. Henson |
| 2/8/13 | | Reviewed med. his P.O. w/ ext. area #30 healing well. No inflammation or swelling. Reviewed GHI and reminded Pt. to complete antibiotic therapy. Gave Motrin pain pack 500mg? 24 tabs. Stable w/ care pain. | M. Long 25 |
| 04/14/16 | | RLS due to unit lockdown (med w/- no exam). HTN. NV exams bluff out + next fillings + #8, #19, #31. Large carious series - will schedule for 4x filling. NV. #17 #19 (O) gr ball. Rx Fiprofin 200 prescription upon pt request. Rec use his Sub. he got pain. | |
| 05/16/16 #31 (O) | | Pm done no exam. 4 My teeth n/t/s filling. #31 has biggest cavity upon extraction - facial. 6cc 2% 1:100,000 epi 2 carp - L/inf/l + Am. NV Operative. 24 PA's taken. Inf. to pt that #31 needs further treatment if symptoms develop. | Tom O. Tom O. |
| 07/01/16 #19 (DO) | | Pm Res - no exam. LA (1-Occ 21% 1:100,000 epi) 1 carp - Ligo/inf - Am - Infil to pt that #19 will need further treatment if symptoms develop. NV. Operative (#3) | Tom O. Tom O. |
| 10.6.16 | | RLS EMERGENCY RECALL | (MD) |
| 2/1/17 | | Pt brought up for dental appt. but pt didn't know why he was scheduled. Did not have chart at time to review hx. Dental Kite requested names for a civil suit only. Advised pt that info can't be released via kite form. Pt stated he already had all required dental tx completed prior. | 25 |

App 62

# EXHIBIT J

DENTAL KITE

# EXHIBIT J




**INMATE REQUEST FORM**

| 1.) INMATE NAME | DOC # | 2 HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Shannon Carter | 70773 | 8C 14A | 1/6/17 |

4.) REQUEST FORM TO: (CHECK BOX)

| | | |
|---|---|---|
| ___ CASEWORKER | X MEDICAL | ___ MENTAL HEALTH |
| ___ EDUCATION | ___ VISITING | ___ LAW LIBRARY |
| ___ LAUNDRY | ___ PROPERTY ROOM | ___ SHIFT COMMAND |

___ CANTEEN    ___ DENTAL    ___ OTHER _____

5.) NAME OF INDIVIDUAL TO CONTACT: _Medical Director_

6.) REQUEST: ( PRINT BELOW) Sir I am filing a civil complaint on the constitutional violations made by dental, to pursue I must inform the court of the defendants full name my kites were signed SB and CM I need the full name of theses defendants which are dentist ass° and the name of my dentist can you Please Provid this information.

Thank you for your time

Shannon Carter

7.) INMATE SIGNATURE _Shannon Carter_    DOC # _70773_

8.) RECEIVING STAFF SIGNATURE _____    DATE _____

**************************************************************

9.) RESPONSE TO INMATE

_refered to dental_

_seen 2/1/17. Patient stated that all dental treatment had already been completed - requested information cannot be released via this form._

-YOUR APPOINTMENT WILL BE WITHIN 60 DAYS OR SOONER

-IF YOUR SYMPTOMS WORSEN PRIOR TO YOUR APPOINTMENT, PLEASE INFORM THE SICK CALL NURSE

**E-MAILED**
1/13/16
to Dr Aranas

10.) RESPONDING STAFF SIGNATURE _____    DATE _____   JAN 2 1 2017

DOC – 3012 (REV. 7/01)

# EXHIBIT K

## DECLARATION OF JENNIFER NASH

# EXHIBIT K

## DECLARATION OF JENNIFER NASH

I, Jennifer Nash, being first duly sworn, under penalty of perjury under the laws of the United States deposes and says:

1. I am currently employed as an Associate Warden of Operations at Florence McClure Women's Correctional Center (FMWCC).  In April of 2017, I was employed as an Associate Warden of Programs at High Desert State Prison (HDSP).

2. In connection with filing this declaration, I was contacted by the Nevada Attorney General's Office, who, on information and belief, is involved in the matter entitled *Carter v. Bean, et al.*, now proceeding in the United States District Court, District Of Nevada, as case number 2:19-cv-01628-RFB-EJY. It was requested that I provide truthful and accurate information concerning the authentication of certain documents submitted by and correspondence with inmate Shannon Carter (Mr. Carter), #70773.

3. I am a defendant in this matter.

4. Through my employment as an Associate Warden, I have knowledge of the process by which an inmate submits grievances and the responses thereto. I also have knowledge of the process by which inmate grievances are responded to and recorded. Inmate grievances are created in the normal course of business conducted at HDSP;

5. As a former Associate Warden at HDSP, it was within my employment duties to receive and respond to certain inmate grievances.

6. Inmate grievances are governed by Nevada Department of Corrections (NDOC) Administrative Regulation (AR) 740. Attached hereto as Exhibit M is a true and correct copy of AR 740 that was in effect at the time of the underlying events.

7. It was HDSP policy, and my own practice, to sign any inmate grievances I received or to which I responded.

8. Prior to filing this declaration, I reviewed inmate Shannon Carter's grievance history and copies of certain grievances, including Grievance 2006-30-23297 and Grievance 2006-30-46164, he has submitted during his incarceration within the NDOC.

9. Document ECF No. 14-1 at 25-29 is a true and correct copy of Grievance 20006-30-23297.

10. Attached hereto as Exhibit L is a true and correct copy of Grievance 2006-30-46164 that inmate Shannon Carter allegedly submitted on or about April 6, 2017.

11. I did not receive Grievance 2006-30-46164 at the time it was submitted.

12. I never reviewed Grievance 2006-30-46164 prior to June 26, 2020.

13. My signature is not affixed to Grievance 2006-30-46164.

14. In Grievance 2006-30-46164, Shannon Carter requested to be transferred to another institution.

15. Interdepartmental transfers of inmates are governed by AR 552 and is a function of the NDOC Offender Management Division (OMD). Attached hereto as Exhibit N is a true and correct copy of AR 552.

16. As Associate Warden of Programs, I did not have authority to transfer Shannon Carter to a different institution because that employment position is not within OMD.

17. Grievance 2006-30-46164 was never submitted beyond Informal Level review.

18. Inmate Shannon Carter has never personally informed me that he did not receive dental treatment on or about February 1, 2017.

19. As an Associate Warden, I am not a health care provider, and I do not have authority to order Nevada Department of Corrections (NDOC) health providers to administer a specific course of treatment.

FURTHER I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

DATED this 28th day of July, 2020

Jennifer Nash

# EXHIBIT L

## GRIEVANCE #2006-30-46164

# EXHIBIT L



**Brian Sandoval**
*Governor*

# Nevada Department of Corrections
### Improper Grievance Memo

**James Dzurenda**
*Director*

**Brian E. Williams, Sr.**
*Warden, HDSP*

TO:      <u>Carter, Shannon</u>      #70773      8C/14

FROM:   <u>J. Nash, AW</u>

DATE:   <u>4/18/2017</u>

RE: Improper Grievance <u>#2006-30-46164 IF Level Grievance</u>

The attached grievance is being returned to you for the following reason(s):

| | |
|---|---|
| **This grievance may NOT proceed to the next level Per AR 740.03,5 due to the following:** | |
| ☐ Non-grievable issue. | |
| ☐ State and federal court decision. | |
| ☐ State, federal and local laws and regulations. | |
| ☐ Parole Board decision. | |
| ☐ Lacks standing. | |
| **X** Untimely submission. | |
| ☐ Abuse of Inmate Grievance Procedure. | |
| ☐ Any language, writing or illustration deemed to be obscene, profane or derogatory. | |
| ☐ A threat of serious bodily injury to a specific individual. | |
| ☐ Specific claims or incidents previously filed by the same inmate. | |
| ☐ More than one (1) grievance per week, Monday through Sunday. | |
| ☐ More than two (2) unfounded, frivolous or vexatious grievances per month. | |

**After correcting the deficiencies(s) listed below; you may re-submit your grievance at the same level.**

☐ The grievance contains more than one (1) appropriate issue.  Only 1 issue is allowed per grievance.

☐ No factual harm/loss noted **and/or** no remedy requested.

☐ Other; specify:

Failure to re-submit the grievance through the prescribed timeframe shall constitute abandonment.

| CCSr BRn | 4/21/17 | X Womass | 4.21.17 |
|---|---|---|---|
| Witness Signature | Date | Inmate Signature | Date |

cc: Original – Inmate
    Copy - Grievance File

DOC-3098 (01/17)

Log Number _2(l(/a 3/) 41/4(4_

## NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: _Shannon Carter_   I.D. NUMBER: _70773_

INSTITUTION: _H.D.S.P_   UNIT: _8 5/4_

GRIEVANT'S STATEMENT: _"Retaliation" on or about February 1, 2017_
_I was placed on Dental Sick call by the A.G.'s office to correct_
_a constitutional violation by H.D.S.P Dental programs Deliberate_
_and indifference, refusing to treat my infected tooth which was and_
_still is causing extreme pain lost of sleep high blood pressure, weight lost from_

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: _Shannon Carter_ ___ DATE: _4·6·17_ TIME: _5:30_

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: _4-12-17_ TIME: _11:05 AM_

GRIEVANCE RESPONSE: _See attached response_
_Not accepted_

CASEWORKER SIGNATURE: _____ DATE: ____

___ GRIEVANCE UPHELD ____ GRIEVANCE DENIED ____ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _____ DATE: _4/9/18_

_____ INMATE AGREES __/__ INMATE DISAGREES

INMATE SIGNATURE: _____ DATE: _4-21-47_

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY
BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| | |
|---|---|
| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

App 67

DOC 3091 (12 / 01)

# EXHIBIT M

AR 740

# EXHIBIT M

# NEVADA DEPARTMENT OF CORRECTIONS
## ADMINISTRATIVE REGULATION
## 740

## INMATE GRIEVANCE PROCEDURE

**Supersedes:**    AR 740 (02/12/10); and AR 740 (Temporary, 06/16/14); 09/16/14; (Temporary, 01/03/17)
**Effective Date:**    03/07/17

**AUTHORITY:** NRS 209.131, 42 U.S.C. § 15601, *et seq.* and 28 C.F.R. Part 115

**PURPOSE:**

1.  The purpose of this Administrative Regulation ("AR") is to set forth the requirements and procedures of the administrative process that Nevada Department of Corrections ("NDOC") inmates must utilize to resolve addressable grievances and claims including, but not limited to, claims for personal property, property damage, disciplinary appeals, personal injuries, and any other tort or civil rights claim relating to conditions of confinement. Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims only if the inmate can factually demonstrate a loss or harm. This procedure describes the formal grievance processes and will guide NDOC employees in the administration, investigation, response and resolution of inmate grievances.

2.  The provisions of this AR shall be effective on or after the effective date of this AR. The provisions of this AR are not retroactive and do not apply to incidents and/or claims that occurred prior to the effective date of this AR.

   A.  Only inmate claims arising out of, or relating to, issues within the authority and control of the NDOC may be submitted for review and resolution by way of the grievance process.

   B.  A good faith effort will be made to resolve legitimate inmate claims without requiring the inmate to file a formal grievance.

3.  This AR does not create any right, liberty or property interest, or establish the basis for any cause of action against the State of Nevada, its political subdivisions, agencies, boards, commissions, departments, officers or employees.

**RESPONSIBILITY:**

1.  The Director, through the Deputy Directors (DDs), shall be responsible in establishing and supervising an inmate grievance process that provides an appropriate response to an inmate's claim, as well as an administrative means for the expression of, and prompt and fair resolution of, inmate problems and concerns.

2. The Warden through the Associate Wardens (AWs) shall be responsible in managing the grievance process at each institution and any facilities under the control of the parent institution. The AW may designate an Inmate Grievance Coordinator to conduct functions required by this regulation.

3. The Offender Management Administrator (OMA) shall be responsible for supervision of the Offender Issue Tracking System (OITS) in the Nevada Offender Tracking Information System (NOTIS), the program and the computer system which manages the inmate grievances.

## 740.01   ADMINISTRATION OF INMATE GRIEVANCES

1. Each institution/facility shall establish locked boxes where all inmates have access to submit their grievances directly to the box. Keys will be issued by the Warden, to an AW and/or a designated staff.

   A. Lock boxes will be maintained in  segregation/max units in a manner in which the inmate will be allowed to have direct access.  A designated staff  may go cell to cell to pick up grievances in   segregation /max units due to security and safety concerns, if necessary.

   B. Emergency grievances will be handed to any staff member for immediate processing per this regulation.

2. Grievances will be treated as legal correspondence and will be gathered daily, Monday through Friday, excluding holidays, by the AW or designated Grievance Coordinator(s) and or designated staff member.

3. Grievance forms will be kept in housing units and may be accessed through the unit staff, the unit caseworker or in the Institutional Law Library. Emergency forms may be accessed through any employee.

4. Grievances may be GRANTED, DENIED or PARTIALLY GRANTED at any level as deemed appropriate after the claim in the grievance has been investigated.

   A.  Grievance findings or responses will not be titled "Substantiated."

5. The Grievance Coordinator should record receipts, transmittals, actions, and responses on all grievances to OITS/NOTIS within three (3) working days of receipt.

   A. The coordinator should sign, date and enter the approximate time as noted on DOC 3091, 3093 and 3094.

   B.  The front page of the grievance should be date stamped the day entered into OITS/NOTIS.

6. Monthly and annual grievance reports generated by OITS/NOTIS will be reviewed by the Deputy Directors (DDs), Wardens and Associate Wardens (AWs) on a quarterly and annual basis.

**740.02   GRIEVANCE RECORDS**

1. Grievance documents shall be stored at the facility/institution where the grievance issue occurred.

    A.   Grievance files shall be in separate files for each inmate and maintained in alphabetical order by the inmate's last name.

    B.   Grievance copies shall not be  placed in an inmate's Institutional or Central File, nor shall they be available to employees not involved in the grievance process.

2. Grievance files shall be maintained at each institution for a minimum of five (5) years following final disposition of the grievance.

3. Employees who are participating in the disposition of a grievance shall have access to records essential to the disposition of the grievance.

4. Inmates will not have access to grievance records unless ordered by a court, as grievance records are considered confidential and they may be redacted if appropriate.

5. Upon completion of each level of the grievance process, the form and all relevant attachments shall be maintained in the inmate's separate grievance file.  Copies shall be given to the inmate.

**740.03   GRIEVANCE ISSUES**

1. Inmates may use the Inmate Grievance Procedure to resolve addressable inmate claims, only if the inmate can factually demonstrate a loss or harm.  Grievances may be filed to include, but not limited to, personal property, property damage, disciplinary appeals, personal injuries, and any other tort claim or civil rights claim relating to conditions of institutional life.   The inmate must state the action or remedy that will satisfy the claim in the grievance.

    a)   If the inmate does not factually demonstrate a loss or harm and does not state the action or remedy that will satisfy the claim the in the grievance, the grievance will be "REJECTED" and returned to the inmate with an explanation as to what was missing in order for the grievance to be processed.

    b)   A Grievance will not be used as a "KITE" to advise staff of issues, actions or conditions that they do not like but suffered no harm or loss.

2. All allegations of inmate abuse by Department staff, employees, agents or independent contractors, shall be immediately reported to the Warden, AWs, and the Inspector General's Office, in accordance with investigator guidelines via the NOTIS reporting system.

    A.   Any third party reporting of sexual abuse against an inmate will be referred to the Warden or designee for entry into the NOTIS reporting system and referral to the Office of the Inspector

General.

B. Inmates who allege abuse other than sexual abuse will be interviewed by a supervisor of the staff who allegedly committed the abuse to ascertain if he/she agrees to pursue administrative remedies, which will be documented in the NOTIS system.

C. Any portion of a grievance that does not indicate an allegation of sexual abuse will have to meet the criteria listed in this section of the AR.

3. Only inmate claims arising out of, or relating to, issues within the authority and control of the Department may be submitted for review and resolution.

    A. Non-grievable issues include:

    1. State and federal court decisions.

    2. State, federal and local laws and regulations.

    3. Parole Board actions and/or decisions.

    4. Medical diagnosis, medication or treatment/care provided by a private/contract community hospital.

4. Claims for which the inmate lacks standing will not be accepted, included, but not limited to:

    A. Filing a grievance on behalf of another inmate unless the inmate is so physically or emotionally handicapped as to be incapable of filing a grievance, and with the other inmate's approval, or in the case(s) of any third party reporting of Sexual Abuse.

    B. The inmate filing the grievance was not a direct participant in the matter being grieved, except a third party allegation of sexual abuse.

    C. An inmate may not file more than one (1) grievance per seven (7) day week, Monday through Sunday. More than one (1) grievance filed during the seven day week period will be rejected, unless it alleges sexual abuse or it is an emergency grievance that involves health or safety claims. If the practice of filing excessive grievances continues, the inmate will be documented for abuse of the grievance system.

    D. The inclusion of more than one grievance, per form will be cause for rejection of the grievance.

    E. Grievances that grieve the same issue in a previously filed grievance will be screened out as a duplicate issue, which is already being considered or has been considered and responded to.

    F. Grievances that grieve the same issue in a previously filed grievance will also be screened out, even if the requested action or remedy is different on the subsequent grievance.

5. In the event an inmate's claim is deemed inappropriate for review or not within the intended scope of this Regulation, the inmate may not appeal that decision to the next procedural level of review unless the inmate can produce evidence the issue in the grievance is within the scope of this AR or that the NDOC has authority to grant the remedy or action being requested.

6. An inmate who is dissatisfied with the response to a grievance at any level may appeal the grievance to the next level, within the substantive and procedural requirements outlined herein, unless the action requested has already been Granted or Partially Granted at a lower level.

   A. Administrators or employees of the institution shall automatically allow appeals without interference unless the grievance is granted or partially granted as stated in Section C of this AR or the grievance has multiple issues/claims or does not request a remedy that is within the authority of the NDOC.

   B. An inmate's election not to sign and date this form at any level shall constitute abandonment of the claim.

   C. If the Grievance is **"Granted"** at any level, the grievance process is considered complete and the inmate's administrative remedies exhausted, and the inmate cannot appeal the decision to a higher level If the inmate files a grievance to a higher level after it has been granted at a lower level, the grievance will be screen out and the notation in the rejection form will state that the grievance has already been granted.

7. Except as required for the initial filing of an Informal Grievance, time limits shall begin to run from the date an inmate receives a response for appeal and the date the Department's respondent receives the appeal.

   A. Time frames are waived for allegations of sexual abuse, regardless of when the incident is alleged to have occurred.

8. An overdue grievance response at any level is not an automatic finding for the inmate.

   A. The response must be completed, even if it is overdue.

   B. The inmate may proceed to the next grievance level, except at the Second Level, if a response is overdue.

   C. The overdue response does not count against the inmate's timeframe for an appeal if he waits for the response before initiating the appeal.

9. Inmates who participate in or utilize the Inmate Grievance Procedure shall not be subjected to retaliation, i.e. an assertion that an employee took some adverse action against an inmate for filing a grievance, except as noted in 740.09.

   A. Retaliation is a grievable issue.

B.  An unfounded claim of retaliation will be handled as an abuse of the grievance procedure.

C.  The action did not reasonably advance a legitimate correctional goal.

10.  Comprehensive responses are required for inmate grievances.  Statements such as "Your grievance is denied" are not acceptable.  An explanation is necessary.

## 740.04   INFORMAL GRIEVANCE

1.      Inmates are expected to resolve grievable issues through discussion with staff whose duties fall within the issue prior to initiating the grievance process, except as noted in AR 740.03, number 2, or where resolution is not possible, such as disciplinary appeals.  Inmates are encouraged to use a kite to bring issues to the attention of staff instead of immediately filing a grievance.

A.  Allegations of sexual abuse will not be referred to a staff member who is the subject of the accusation of sexual abuse.

B.  Inmates are not required to use an informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse.

2.  An informal resolution may be accomplished in writing or in direct consultation with the appropriate staff.

## 740.05   INFORMAL GRIEVANCE

1. At the  Informal Level, an inmate shall file a grievance (Form DOC-3091) after failing to resolve the matter by other means such as discussion with staff or submitting a kite.

2. Grievances should be reviewed, investigated and responded to by the staff member that has responsibility over the issue that is being grieved.  For example; a medical issue will be submitted to the medical department.  Food issues will be submitted to the culinary department.  Other examples include but not limited to:

A.  Informal grievances addressing property issues should be responded to by the Property Sergeant or equivalent.

B.  All allegations of sexual abuse will be referred to the Inspector General's Office for investigation via the First Level Grievance (DOC 3093).  When an issue goes directly to the first level, the inmate shall file an Informal Grievance form for tracking purposes only.

(1)  The Grievance Coordinator will forward a copy of the grievance to the Inspector General's Office immediately upon receipt.

(2)   If the Grievance is forwarded to the Inspector General's Office, the grievance will be listed as "Partially Granted."  A partial granting of a grievance is not to be interpreted as to

denote that the request for investigation is granted, but rather the claims are being referred to the Inspector General's Office for investigation. The "Partial Grant" is not meant to imply that that the action or remedy requested is being granted such as a request that an employee be disciplined  Even if the claims against a staff member are sustained, the inmate is not privy to personnel action taken against a staff member.

C.  The Inspector General's Office will have 90-days to respond to this allegation.

D.  High Risk Prisoner (HRP) status.

(1)  First Level by the Deputy Director.

(2)  Informal grievances that will be responded to by the Warden or designee.

(3)  Second level by the Director or designee.

E.  Informal grievances addressing medical/mental health/dental issues should be responded to by health care supervisor such as the Director of Nursing at the institution.

F.  If the person who would normally respond to a grievance is the subject of the grievance, the Correctional Caseworker (CCS III/AW) should respond to the Informal Grievance.

3.  The response to the grievance should be substantial, referencing all policies, procedures, rationale, and/or circumstances in finding for or against the inmate.

4.  The inmate shall file an informal grievance within the time frames noted below:

A.  Within one (1) month if the issue involves personal property damage or loss, personal injury, medical claims or any other tort claims, including civil rights claims.

B.  Within ten (10) days if the issue involves any other issues within the authority and control of the Department including, but not limited to, classification, disciplinary, mail and correspondence, religious items, and food.

C.  When a grievance cannot be filed because of circumstances beyond the inmate's control, the time will begin to start from the date in which such circumstances cease to exist.

D.  Time frames are waived for allegations of sexual abuse regardless of when the incident is alleged to have occurred.

5.  An inmate should use Form DOC-3097, Grievant Statement Continuation Form, if unable to present the details of their claim in the space available on the above forms.

A.  All documentation and factual allegations available to the inmate must be submitted at this level with the grievance.

6.  All grievances submitted should also include the remedy sought by the inmate to resolve this

claim.

    A.  Failure to submit a remedy will be considered an improper grievance and returned to the inmate using Form DOC-3098, Improper Grievance Memorandum, except any grievance or portion of a grievance that alleges sexual abuse.

7.  If the inmate's remedy to their grievance includes monetary restitution or damages, then the inmate will get the following forms from unit staff, unit caseworker, or law libraries:

    A.  Form DOC-3026, Inmate Property Claim, which shall be completed and submitted in addition to the grievance for all property loss or damage claims.

    B.  Form DOC-3095, Administrative Claim Form, which shall be completed and submitted in addition to the grievance for all personal injury, tort, or civil rights claims.

8.  Failure by the inmate to submit a proper Informal Grievance form to the Grievance Coordinator or designated employee in their absence, within the time frame noted in 740.05, number 4, shall constitute abandonment of the inmate's grievance at this, and all subsequent levels, except any portion of the grievance that alleges sexual abuse.

    A.  When overdue grievances are received, they will be logged into the OITS/NOTIS.

    B.  The grievance response Form DOC-3098 will note that the inmate exceeded the timeframe and no action will be taken, except any portion of the grievance that alleges sexual abuse.

9.  If the issue raised is not grievable, or the grievance is a duplicate of a prior grievance, the Grievance Coordinator will return the grievance to the inmate with Form 3098 noting the reason.

10.  When an issue goes directly to the Warden (first level) for a decision such as disciplinary appeals, visiting denials, any allegation of sexual abuse or mail censorship, the inmate shall file an Informal Grievance form for tracking purposes.

11.  Grievances alleging staff misconduct will be reviewed by the Warden and if deemed appropriate will be forwarded to the Office of the Inspector General through the OITS/NOTIS.

    A.  The Informal Response will reflect this action being initiated.

    B.  Timeframes are suspended until a disposition is received from the Inspector General's Office.

12.  The time limit for a response to the informal grievance is forty-five (45) days from the date the grievance is received by the grievance coordinator to the date returned to the inmate.

    A.  The inmate must file an appeal within five (5) days of receipt of the response to proceed to the next grievance level.

B.  Transmission of the grievance to another institution may result in exceeding this timeframe.

## 740.06   FIRST LEVEL GRIEVANCE

1.  A First Level Grievance (Form DOC-3093) should be reviewed, investigated and responded to by the Warden at the institution where the incident being grieved occurred, even if the Warden is the subject of the grievance, except in any allegation of sexual abuse.

A.  The Warden may utilize any staff in the development of a grievance response.  The grievance will be responded to by a supervisor that has authority over the issue claimed in the grievance.

B.  First Level medical/mental health/dental issues should be responded to by the highest level of Nursing Administration at the institution (DONs I or II).

C.  First Level property issues should be responded to by the Associate Warden of Operations after being investigated by a sergeant or lieutenant and reviewed by the Warden.

D.  All grievances containing allegations of sexual abuse will be referred to the Inspector General's Office for investigation and they will be designated as "PARTIALLY GRANTED" indicating that it has been submitted for investigation by the Inspector General's Office.

(1)  The Inspector General's Office shall make a final decision on the merits of any portion of the sexual abuse grievance within 90 days of the initial filing of the grievance and if applicable the matter assigned for official investigation.

(2)     The Inspector General's Office may claim an extension of time to respond to a sexual abuse grievance of up to 70 days if the normal time period for response is insufficient to make an appropriate decision.

(3)  The Inspector General's Office shall notify the inmate in writing of any such extension and provide a date by which a decision will be made.

(4)  Upon the completion of the investigation into sexual abuse the inmate shall be informed of the outcome of the investigation by the Inspector General's Office.

2.  At this level the inmate shall provide a signed, sworn declaration of facts that form the basis for a claim that the informal response is incorrect.  This should include a list of persons, if any, who have relevant knowledge or information supporting the claim.  Any additional relevant documentation should be attached at this level.

3.  A First Level Grievance that does not comply with procedural guidelines shall be returned to the inmate, unprocessed, with instructions using Form DOC-3098, if applicable, for proper filing via the caseworker.

A.  Third parties, including fellow inmates, staff members, family members, attorneys, and

outside advocates shall be permitted to assist inmates in filing a grievance(s) relating to allegations of sexual abuse.

B. If a third party files on behalf of the inmate, the facility may require as a condition of processing the request that the alleged victim agree to have the request filed on his or her behalf.

C. If a third party files on behalf of the inmate, the facility may also require as a condition of processing the grievance, the alleged victim to personally pursue any subsequent steps in the grievance process.

4. The time limit for a response to the inmate for the First Level grievance is forty-five (45) days from the date the grievance is received by the grievance coordinator to the date returned to inmate.

A. The inmate must file an appeal within five (5) days of receipt of the response to proceed to the next grievance level.

B. Transmission of the grievance to another institution may result in exceeding this timeframe.

## 740.07   SECOND LEVEL GRIEVANCE

1. A Second Level Grievance (Form DOC - 3094) should be reviewed and responded to by the:

A. Deputy Director of Operations for facility custody or security operations that do not include programs.

B. Deputy Director of Programs for all program issues such as education, visiting, or religious programming.

C. The Deputy Director of Support Services for fiscal, property and telephone issues.

D. The Offender Management Administrator (OMA) for classification and timekeeping issues.

E. The Medical Director for medical/ dental issues, including medical co-pays or charges.

F. The Mental Health Administrator for mental health issues.

G. The Chief Medical Officer for medical issues, including medical co-pays or charges.

E. The inmate may appeal the decision related to a sexual abuse grievance response from the Inspector General's Office within five (5) days of the grievance, with a subsequent response from the Deputy Director for security program, religious and operations.

2. The Grievance Coordinator shall forward copies of all related documents and the appeal to the Deputy Director for review and distribution to other Appointing Authorities and Division Heads.

3. The time limit for a response to the inmate for the Second Level grievance is sixty (60) days, not including transmittal time, from the date the grievance is received by the grievance coordinator to

the date it is returned to inmate.

4. Administrators shall respond to the Second Level Grievance, specifying the decision and the reasons for the decision, and return it to the Grievance Coordinator.

## 740.08   REMEDIES TO GRIEVANCES

1. Grievance remedies should be determined with the goal of appropriately resolving legitimate claims at the lowest level of review possible, considering each institution's particular operational, security and safety concerns.

2. Remedies available for grievances may include, but are not limited to, the following:

A. Appropriate measures to resolve unsafe or unsanitary conditions of confinement.

B. Appropriate measures to address the violation of an inmate's constitutional, civil or statutory rights.

C. Appropriate measures to protect inmates from criminal or prohibited acts committed by Departmental employees and staff or other inmates.

D. Appropriate measures to revise, clarify and implement written Departmental and institutional rules or procedures necessary to prevent further violations.

E. Appropriate measures to provide a disabled or physically impaired inmate with reasonable accommodation or reasonable modification.

F. Appropriate monetary reimbursement for property loss, damage, personal injury, tort, or civil rights claims arising out of an act or omission of the Department of Corrections or any of its agents, former officers, employees or contractors.

3. When deemed appropriate by the staff person rendering a decision on a grievance, a proposed monetary remedy may be submitted to the Deputy Director of Support Services who may award monetary damages at any level of the Inmate Grievance. Once approved:

A. A Form DOC-3096, Administrative Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims, except for personal property damage or loss.

B. A Form DOC-3027, Property Claim Release Agreement, will be completed and submitted by the inmate on all monetary claims for personal property damage or loss.

C. When property claims are settled informally at an institution, DOC 2027 Property Release Agreement will be completed.

4. Compensation for loss of personal property, property damage, personal injury or any other claim arising out of a tort shall not exceed five hundred ($500.00).

**740.09   ABUSE OF THE INMATE GRIEVANCE PROCEDURE**

1.  Inmates are encouraged to use the Grievance Procedure to resolve addressable claims where the inmate can define a specific loss or harm, however, they are prohibited from abusing the system by knowingly, willfully or maliciously filing frivolous or vexatious grievances, which are considered to be an abuse of the Inmate Grievance Procedure.  Any of the below listed violations will result in the grievance be rejected.

2.  It is considered abuse of the inmate grievance procedure when an inmate files a grievance that contains, but is not limited to:

    A.  A threat of serious bodily injury to a specific individual.

    B.  Specific claims or incidents previously filed by the same inmate.

    C.  More than two (2) unfounded, frivolous or vexatious grievances per month.  The third unfounded, frivolous or vexatious grievance in a 30 day period will result in a disciplinary action against the inmate for abuse of the grievance system.  The date of the first unfounded grievance will be the beginning of the 30 day period. .

    D.  Filing two (2) or more emergency grievances in a seven (7) day week period, Monday through Sunday  which are deemed not to be emergencies, will result in disciplinary action against the inmate for abuse of the grievance system.

    E.  Obscene, profane, and derogatory language.

    F.  Contains more than one (1) appropriate issue, per grievance.

    G.  The claim or requested remedy changes or is modified from one level to another.

3.  If an inmate files a grievance as listed in (2), the assigned caseworker shall:

    A.  Return a copy of the improper grievance to the inmate and Form DOC-3098, Improper Grievance Memorandum, noting the specific violation.

    B.  Give the original to the inmate.

    C.  Return a copy to the Grievance Coordinator for inclusion in the inmate's grievance file.

    D.  If the inmate grievance alleges a threat to the safety and/or security of the institution, the grievance will be entered regardless of the content.

4.  The inmate shall **not** be given additional time to re-submit the grievance in the proper form.

    A.  The inmate's failure to re-submit the grievance in the proper form and **within the**

**prescribed time frame** shall constitute abandonment.

B.  If the timeframe has been exhausted prior to the inmate receiving Form DOC- 3098, the inmate has five (5) days from the date it was received to re-submit.

5.  An inmate who satisfies the criteria contained in 740.09 Section 2 above should:

A.  Be brought to the attention of the Grievance Coordinator as soon as possible.

B.  The Grievance Coordinator should review all documentation supporting the alleged abuse to determine if abuse has occurred and forward a written recommendation to the Warden.

C.  The Warden should review and, if warranted, forward to the DDs with a recommendation that a Notice of Charges be issued.

D.  Only the DDs can write a Notice of Charges on the inmate if they determine an abuse of the grievance process.

E.  The DDs will forward the Notice of Charges to the Warden for processing through the inmate disciplinary process.

F.  A conduct violation of this nature is not a form of retaliation.

G.  An inmate may not be disciplined for filing a grievance related to alleged sexual abuse unless the Department has demonstrated that the inmate filed the grievance in bad faith.

## 740.10   EMERGENCY GRIEVANCE PROCEDURE

1.      An Emergency Grievance (Form DOC-1564) received by any staff member shall be immediately delivered to the shift supervisor no later than is reasonable and necessary to prevent serious injury or a breach of security.

2.      Any emergency grievance alleging that an inmate is subject to substantial risk of imminent sexual abuse shall be immediately forwarded to the highest ranking staff member on duty so that corrective action may be taken immediately which may include moving the inmate to administrative segregation for protective custody.

A.  The inmate shall receive a response to the emergency grievance within 24 hours, with a final facility decision about whether the inmate is in substantial risk of imminent sexual abuse within two (2) regular work days.

B.  The initial response, final decision and the action taken in response to the emergency grievance will be documented.  Action taken can include, but not be limited to:

(1)      Refer the information to the Inspector General's Office;

    (2)     Afford the inmate appropriate medical, mental health care; and

    (3)     Address any safety considerations.

2.  The shift supervisor may confer with the on duty medical staff, Warden or Associate Warden and, if necessary, the DDs, to determine whether the grievance constitutes an emergency.

3.  The highest-ranking staff member on duty, with the aid of an authorized Department official, shall immediately take any corrective measures necessary to prevent a substantial risk of injury or breach of security.

4.  The Department official receiving the Emergency Grievance should respond to the filing inmate no later than is necessary to prevent serious injury or a breach of security.

5.  In the event the inmate requests further review of a claim not deemed an emergency, the inmate may file a grievance appeal commencing at the Informal Level.

6.  A copy of the emergency grievance will be forwarded to the Grievance Coordinator for entry into OITS/NOTIS for processing and tracking purposes.

## 740.11   INMATE TRANSFERS

1.  Inmates transferred to another institution pending the resolution of a filed grievance shall have the grievance completed at the sending institution at all levels.

    A.  The receiving institution is responsible for logging in and tracking the grievance through the OITS/NOTIS.

    B.  All responses and correspondence shall be conducted via first class mail to the Grievance Coordinator at the receiving institution.

2.  Timeframes do not apply if the inmate has been transferred.  Grievances shall be processed as soon as practicable and timeframes shall be adhered to as closely as possible

3.  If an inmate expires his sentence or leaves the Department on parole, the grievance will be finalized on the current level.   No further appeal may occur.

    A.  It is the responsibility of the inmate to provide a forwarding address during the release process in order to receive a grievance response.

## APPLICABILITY

1.  This regulation requires an operational procedure for each institution and facility.

2.  This regulation requires an audit using the attached checklist form as a guide.

**REFERENCES**

ACA Standards, 4th Edition and 2008 Supplement,4-4105, 4-4276, 4-4284, 4-4344, 4-4394, 4-4429, 4-4429-1

**ATTACHMENTS**

DOC Form 3065, Inmate Grievance Audit Questions

James Dzurenda, Director

3/7/17
Date

## INMATE GRIEVANCE AUDIT QUESTIONS

1. Are there existing locked boxes throughout the institution that are accessible to all inmates?

2. Who has access to the keys to these boxes?

3. Is this procedure available to inmates in the institution?

4. Are the grievances being responded to by the appropriate party at each level?

5. Are grievances responded to within the time frame allowed?

6. Are grievance files maintained separately and in alphabetical order?

7. Are all threats of abuse, harassment or misconduct referred to the IG's office?

    A. Does the inmate receive a response to this effect?

8. Are grievance responses addressing the issue of complaint in a thorough manner in order to resolve each grievance at the lowest level?

9. Is form DOC-3098 being utilized properly when an inmate is not complying with the AR?

10. Are all informal grievances being entered into the OITS?

11. How are pending grievances being followed up on when an inmate transfers to another institution?

12. Is an audit performed at the institution with any frequency to determine outstanding grievances?

13. Do grievances regarding property claims contain all the necessary paperwork? Are legitimate claims resolved in a timely manner?

14. Were emergency grievances handled in an expeditious, professional manner?

15. Are grievance files maintained at the institution according to policy?

# EXHIBIT N

AR 552

# EXHIBIT N

# NEVADA DEPARTMENT OF CORRECTIONS
# ADMINISTRATIVE REGULATION
# 552

# INTRA-DEPARTMENTAL TRANSFERS

**Supersedes:**     AR 552 (06/17/12) and AR 552 (Temporary, 03/01/13)
**Effective Date:**     03/19/13

**AUTHORITY:** NRS 209.261, 209.273, 209.291, 209.293

**RESPONSIBILITY**

The Offender Management Administrator (OMA) is responsible for approving and implementing inmate transfers.

The Warden designates institutional caseworkers who are responsible for the preparation of approved transfers.

## 552.01   VOLUNTARY TRANSFERS

1.  An inmate may request, through the classification process, to be transferred to another institution or facility. This does not create any liberty interest for the inmate in his/her actual housing, custody or assignment nor does it imply that the request has to be honored.

2.  Upon approval of the classification at the institutional level and by the Offender Management Division (OMD), the inmate may be moved immediately or placed on a transfer waiting list Priority list (P-list) in the Nevada Offender Tracking Information System (NOTIS).

3.  An approved transfer may be rescinded at any time by the department at the discretion of the OMD without cause.

## 552.02   INVOLUNTARY TRANSFERS

1.  An inmate may be involuntarily transferred between institutions and/or facilities.

2.  A classification committee recommends whether or not an inmate is to be involuntarily transferred.

3.  If a transfer does not result in an increase of custody, it is not considered to be an involuntary transfer for the purposes of this regulation.

4.  If the involuntary transfer involves an increase in assigned custody of the inmate, the classification process should include a 48 hour written notice prior to the hearing, detailing the proposed action and reason for this action.

5.  If the classification committee's recommendation is approved by OMD, the inmate may be moved immediately or placed on the P-list.

6.  Classification committee decisions can be appealed by the inmate utilizing the inmate grievance process.  Based on case factors, the transfer need not be delayed pending resolution of a grievance.

## 552.03    EMERGENCY INVOLUNTARY TRANSFERS

1.  Emergency involuntary transfers may be made administratively without a hearing at the discretion of the warden/designee with the approval of OMD.

2.  A transfer may be implemented by the warden of the sending institution with the concurrence of the warden at the receiving institution after normal business hours.

3.  If this option is exercised, formal approval from OMD should be obtained at the earliest practicable opportunity following the actual transfer.

4.  In all cases, the reclassification process prescribed by AR 503, Conduct of Objective Classification, should be conducted at the receiving institution as soon as practicable following the actual transfer but not to exceed 72 hours excluding holidays and weekends.

## 552.04    TEMPORARY TRANSFERS

1.  Temporary transfers of inmates between institutions or facilities for court or medical purposes may be implemented administratively with the approval of OMD.

2.  Transfers to outside medical facilities which do not involve a change in the inmate's assigned custody may be implemented administratively by the warden/designee in accordance with the 600 series of the Administrative Regulations relating to Medical and Health Care Services.

### 552.05  PROCESS TO IMPLEMENT AN APPROVED INTRA-DEPARTMENTAL TRANSFER

1. For institutional transportation coordinators and their adjacent conservation camps, the regular weekly transportation manifest will be prepared as follows:

A.  On a weekly basis, OMD will distribute by e-mail, to the institutional transfer coordinators, the list of inmates (Transportation Manifest Update) identified as being placed on the transportation Manifest in the Nevada Offender Tracking Information System (NOTIS).

B.   This list will include inmates needing to move pursuant to administrative transfer provisions not necessarily limited to:

(1)  Judicial orders for production of inmates.

(2)  Inmates needing transfer for medical appointments.

(3)  Transfers to facilitate releases from rural camps.

(4)  Transfers to Minimum custody camps and facilities.

C.  Inmates on the Transportation Manifest will be selected from the P-list and also from institutional requests (wish lists) e-mailed to the OMD transportation coordinator no later than 9:00 am Thursdays.

D.  The institutions should receive the transportation manifest update at least 2 working days prior to the movement.

E.  Any additions or deletions to the transportation manifest after it has been sent to the institutional transfer coordinators will be communicated by e-mail.

### 552.06   INSTITUTIONAL TRANSFER COORDINATOR DUTIES

1. Notification to staff.

A.   Upon receipt of the transportation manifest update, the institutional transfer coordinator should develop an institutional list for distribution to staff having a responsibility for the preparation process, after having screened the list for the following:

(1)  Scheduled local court appearances.

(2)  Scheduled Parole Board hearing.

(3)  Proximity to discharge or parole.

(4)  Pending disciplinary hearings for resolution prior to transfer.

(5)  Review for possible separation/enemy issues at the receiving institution.

B.  This list will be given to the institutional Director of Nursing Services (DONS) with a request for medical clearance.  This request will serve to obtain clearance from medical, dental and mental health services.

(1)  Notifications and requests for clearance will include the inmates name and number, destination and departure date and time.

(2)  Prompt response and notice from all involved staff will be requested by the transfer coordinator with regard to completed work, potential problems, cancellations and clearances.

C.  Inmates will be allowed to keep Keep On Person (KOP) medications on their person during roll-up of their property and will retain those KOP medications during the transport.

D.  Notice regarding cancellation.

(1)  If during the preparation process it is determined that an inmate must be removed from the list, the transfer coordinator will promptly notify the following:

a.  The OMD transfer coordinator, to advise the reason for the removal and date the inmate can be reconsidered.  Appropriate direction will be given as to whether the inmate should be reclassified or remain on the P-list and whether a replacement inmate will be placed on the manifest.

b.  Local staff involved in the preparation/clearance process.

E.  Final check

(1)  On the afternoon preceding the scheduled departure, the transportation coordinator will make certain of the following:

a.  All records, files, property and travel documents are properly accounted for and staged in the designated pick-up location.

b.  Information is provided to the transportation officers if 3 day supplies of prescribed medication are necessary for pick-up.

c.  Exit/transfer  entries will be made into the NOTIS case notes, which will address the inmate's current status and reason for transfer.

F.  Problem resolution.

(1)  The transportation coordinator should be alert to potential transportation problems and should seek to resolve these situations through early intervention so as to not delay the transportation process.

(2)  The work hours of the transfer coordinator should be arranged so that he/she is on duty when the weekly transport departs the institution.

**APPLICABILITY**

1. This procedure does not require an operational procedure.

2. This regulation does not require an audit.

**REFERENCES**

ACA Standard 4-4288, 4-4289 and 4-4344

_____          _____
James G. Cox, Director                                        Date

# EXHIBIT O

## DECLARATION OF BRIAN WILLIAMS

# EXHIBIT O

## DECLARATION OF BRIAN WILLIAMS, SR.

I, Brian Williams, Sr., being first duly sworn, under penalty of perjury under the laws of the United States deposes and says:

1. I am currently employed as Deputy Director of Programs with the Nevada Department of Corrections (NDOC). In July of 2017, I was employed as the Warden of High Desert State Prison (HDSP);

2. In connection with filing this declaration, I was contacted by the Nevada Attorney General's Office, who, on information and belief, is involved in the matter entitled *Carter v. Bean, et al.*, now proceeding in the United States District Court, District Of Nevada, as case number 2:19-cv-01628-RFB-EJY. It was requested that I provide truthful and accurate information concerning the authentication of certain documents and communications with Mr. Cater.

3. I am a Defendant in this matter.

4. As the Warden at HDSP, I am not involved in the scheduling or determination of the course of medical or dental treatment inmates receive, including inmate Shannon Carter, inmate # 70773 (Mr. Carter).

5. Through my employment as a HDSP Warden, I have knowledge of the manner in which inmates at HDSP generally request medical treatment. The requests are typically submitted by a kite to the HDSP medical department.

6. On or about July 6, 2017, I received a kite from Mr. Carter alleging he needed dental treatment. A true and correct copy of that kite has been filed in this case as ECF No. 14-1 at 51.

7. After I received the kite, I contacted the HDSP dental department and informed them I had received kite from Mr. Carter regarding his request for dental care. I also requested that Mr. Carter be scheduled to be seen. I was advised that Mr. Carter would be scheduled for an appointment.

8. On July 7, 2017, I responded to the kite.

9. While warden at HDSP, if an inmate verbally informed me of a medical or dental concern, it was my custom and practice to inform HDSP medical staff of the inmate's issue.

10. I do not recall having a personal conversation with Mr. Carter, after responding to the kite, regarding his dental condition or treatment he received from the HDSP dental department.

11. I never communicated to Mr. Cater that he must have "pissed off" HDSP dental staff.

12. Had Mr. Carter verbally informed me of a dental complaint, I would have contacted HDSP dental staff and requested that Mr. Carter's complaints be addressed.

13. I do not have any personal knowledge of Mr. Carter's dental treatment nor was I involved in scheduling or determining his dental treatment.

FURTHER I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

DATED this **23** day of July, 2020

Brian Williams, Sr.

# EXHIBIT P

## DECLARATION OF SCHERRIE BEAN

# EXHIBIT P

## DECLARATION OF SCHERRIE BEAN

I, Scherrie Bean, being first duly sworn, under penalty of perjury under the laws of the United States deposes and says:

1. In connection with filing this declaration, I was contacted by the Nevada Attorney General's Office, who, on information and belief, is involved in the matter entitled *Carter v. Bean, et al.*, now proceeding in the United States District Court, District Of Nevada, as case number 2:19-cv-01628-RFB-EJY. It was requested that I provide truthful and accurate information concerning the authentication of certain documents and dental care provided to of inmate Shannon Carter (Mr. Carter), #70773;

2. I am a defendant in this matter.

3. In February 2017, I was employed by the Nevada Department of Corrections (NDOC) as a dental assistant.

4. As a former dental assistant, I have knowledge of the process by which inmates request and receive dental care.

5. My job responsibilities as a dental assistant included set up and break down before and after treatment. I also assisted the dentist during treatment.

6. On February 1, 2017, Mr. Carter presented to the High Desert State Prison dental clinic.

7. At the time Mr. Carter presented, Dr. Paul Bitar and myself were present.

8. I did not review Mr. Carter's dental chart prior to him presenting to the HDSP dental clinic on February 1, 2017.

9. During the February 1, 2017, visit, Mr. Carter stated that he did not have any dental issues and he did not want to be seen for treatment.

10. Instead, Mr. Carter wanted the names of HDSP dental staff who had previously provided him care for a lawsuit.

11. Dr. Bitar informed Mr. Carter that he could not release that information, and Mr. Carter left the HDSP clinic.

12. Mr. Carter was not denied dental treatment on February 1, 2017.

13. During the visit, I never referred to Mr. Carter in a derogatory manner or referenced any lawsuit he had filed against me.

14. As of February 1, 2017, I was unaware Mr. Carter had filed a lawsuit against me, or had attempt to serve me in relation to any lawsuit in which I was a named defendant.

15. Following February 1, 2017, I did not receive or review any kites submitted by Mr. Carter wherein he complained of a dental condition or requested dental treatment.

FURTHER I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

DATED this ____ day of July, 2020

Scherrie Bean